J-S05024-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: H.J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1232 MDA 2021 |

Appeal from the Order Entered August 20, 2021
In the Court of Common Pleas of Union County
Orphans' Court at No:  19-8056

BEFORE:  PANELLA, P.J., STABILE, J., and DUBOW, J.

MEMORANDUM BY STABILE, J.:                **FILED MARCH 14, 2022**

A.P. ("Father") appeals from the order dated August 18, 2021, and docketed August 20, 2021,[1] in the Union County Court of Common Pleas, granting the petition of D.F. and C.F., Child's legal custodians ("Custodians"), and terminating involuntarily his parental rights to his minor son, H.J.B.

---

[1] While the docket reflects an entry date of August 20, 2021, there is no notation on the dockets that notice was given and that the orders were entered for purposes of Pa.O.C.R. 4.6(b) (stating, "The clerk shall note in the docket the date when notice was given to the party or to his or her counsel under subparagraph (a) of this Rule."). **See** Note Pa.O.R. 4.6 (noting that the Rule is "derived from Pa.R.C.P. No. 236."); **see also Frazier v. City of Philadelphia**, 735 A.2d 113, 115 (Pa. 1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given"); **see also** Pa.R.A.P. 108(a) (entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the decree has been given as required by Pa.R.Civ.P. 236(b)".).  Thus, the order was not entered and the appeal period not triggered.  Although we consider the matter on the merits, we caution the Court of Common Pleas of Union County as to compliance with the rules with regard to the entry of orders.

("Child"), born in July 2016, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), and (b).[2]  After careful review, we affirm.

At the time of Child's birth, his mother, B.B. ("Mother") was incarcerated at State Correctional Institution ("SCI") - Muncy.  Custodians received custody of Child through a prison ministries organization, and with the consent of Mother, two days after Child's birth.  N.T., 3/9/21, at 8-9.  Child remained with Custodians until Mother's release in April 2017.  *Id.* at 10.  Child then returned to Custodians in September 2017, after briefly residing with his maternal grandmother, upon Mother's reincarceration in July 2017.[3]  *Id.* at 10-13, 44.  He has remained in the care and custody of Custodians since.  *Id.* at 13.

Custodians filed a custody action on December 18, 2017, naming Mother only, as they were unaware of the identity of Child's biological father at the time.[4]  N.T., 8/18/21 at 12-13; N.T., 3/9/21, at 13, 50-51.  At a hearing on

_____

[2] It was noted on the record at the termination hearing that Child's mother, B.B. ("Mother"), agreed to terminate her parental rights voluntarily.  N.T., 8/18/21 ("After meeting with counsel in chambers, it's my understanding that [Mother] and [Custodians] have reached an agreement to prepare a post-adoption custody agreement, and she is -- will be signing a Voluntary relinquishment of Parental Rights.").  We observe that the docket does not reflect any disposition related to Mother.

[3] Mother was released in or around June 2018.  N.T., 3/9/21, at 16.

[4] Notably, the orphans' court incorporated the record of the custody proceedings at the termination hearing.  *Id.* at 15-16.  While the custody record was not included as part of the certified record, we do not find this necessary for our review and determination.

March 12, 2018, Mother, who was incarcerated at the time, refused to provide the name of Child's father.[5]  N.T., 8/18/21, at 13; N.T., 3/9/21, at 15, 17, 50-51.  By order of March 12, 2018, the court, pending further order, awarded Custodians sole legal and physical custody and required Mother to provide her address to the court upon her upcoming release from prison, scheduled for June 6, 2018.  *Id.* at 43.  Subsequently, by order of January 11, 2019, finding a lack of compliance on the part of Mother as to the supplying of her address, the court made its March 12, 2018 order a final order.  *Id.*  Custodial mother, D.F., learned of Father's identity around March 18, 2019.  N.T., 3/9/21, at 65-66.

Child's custodians filed a petition for involuntary termination of Mother's and Father's parental rights on July 3, 2019, pursuant to 23 Pa.C.S.A. § 2511(a)(1).  They additionally filed a contemporaneous Report of Intention to Adopt.

After numerous continuances, the orphans' court conducted a hearing on March 9, 2021.  Mother and Father were present[6] and represented by counsel, Jasmin Smith, Esquire and Patrick Johnson, Esquire, respectively.  Child was represented by Mark H. Lemon, Esquire, who the court appointed as his legal counsel pursuant to order dated October 23, 2019.  Custodians

---

[5] Mother confirmed that she failed to identify Father when asked by the court, indicating that she "pled the Fifth."  N.T., 8/18/21, at 13.

[6] Father appeared late, after the hearing had commenced, indicating he got lost and stuck in traffic.  *Id.* at 4, 36.

presented the testimony of custodial mother, D.F., as well as Father as on cross-examination. Father's testimony was not able to be completed and the matter was re-listed.[7]

After several more continuances,[8] the termination hearing resumed on August 18, 2021. Mother, who was again incarcerated, was present and represented by Attorney Smith. Father failed to appear[9] but was represented by Attorney Johnson. Further, Child was again represented by Attorney Lemon.[10] Custodians presented the testimony of Mother as on cross-examination.

At the conclusion of the hearing, the orphans' court announced its decision to terminate Father's parental rights. N.T., 8/19/21, at 39-42. The court then issued an order dated August 18, 2021, and docketed August 20,

_____

[7] Additionally, Father presented and admitted Exhibit F-1, a corrected birth certificate issued July 22, 2019, which was not included in the certified record. We do not, however, find this necessary for our review.

[8] Father requested a continuance of a June 17, 2021 listing, citing exposure to COVID-19. He was later found in contempt for failure to provide evidence related to this claimed COVID-19 exposure as ordered. N.T., 8/18/21, at 4-8.

[9] Attorney Johnson confirmed that Father was incarcerated. As the orphans' court determined that Father failed to notify counsel so that appropriate arrangements could be made for his participation, the court declined to delay the proceedings. *Id.* at 5, 8-10.

[10] Attorney Lemon argued in favor of termination of Father's parental rights. *Id.* at 31. He further submitted a brief to this Court in support of the termination of Father's parental rights.

2021, memorializing its decision and referencing its reasoning placed on the record.[11]

Thereafter, on September 17, 2021, Father filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On October 29, 2021, the orphans' court issued a Rule 1925(a) Opinion.

On appeal, Father raises the following issue for our review:

1. Did the [t]rial [c]ourt commit an abuse of discretion in terminating the parental rights of [Father], pursuant to 23 Pa. C.S.[A.] § 2511(a)(1), when [Father] was unlawfully prevented from performing parental rights due to the removal of the minor child from his locality with no reasonable way for [Father] to locate the minor child and the failure of the court system to mandate his inclusion in a custody matter involving the minor child?

Father's Brief at 4 (suggested answer omitted).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. The trial court's decision, however, should not be reversed merely

---

[11] While the orphans' court does not reference specific subsections of Section 2511 as it relates to the termination of Father's parental rights in its order, the court addresses subsections (a)(1) and (b) in its reasoning placed on the record and in its Rule 1925(a) Opinion.

because the record would support a different result. *Id*. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct,

- 6 -

weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (quoting ***Matter of Adoption of Charles E.D.M., II***, 708 A.2d 88, 91 (Pa. 1998)).

In this case, the orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to Section 2511(a)(1) as follows:

To satisfy the requirements of Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. **Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.**

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (internal citations omitted) (emphasis added).

As it relates to the crucial six-month period prior to the filing of the petition, this Court has instructed, "[I]t is the six months immediately preceding the filing of the petition that is most critical to our analysis. However, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case." *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999) (citations omitted). This requires the Court to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental

rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." ***In re B., N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted).

Further, we have stated:

[T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

***In re Z.P.***, 994 A.2d 1108, 1119 (Pa. Super. 2010) (citation omitted); ***see also In re Adoption of C.L.G.***, 956 A.2d 999, 1006 (Pa. Super 2008) (*en banc*).

Regarding the definition of "parental duties," this Court has stated:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her

ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d at 855 (internal citations omitted).

In the case at bar, in finding grounds for termination of Father's parental rights pursuant to Section 2511(a)(1), the orphans' court reasoned that Father was aware of Child's birth and his paternity and yet he failed to inquire as to Child or perform any parental duties or responsibilities. The court stated:

[Father] testified that he knew he was the father of [C]hild while [Mother] was pregnant and incarcerated. He further testified that he got to see his son when [C]hild was ten (10) months old in 2017.

[Father] took no action to obtain custody of [C]hild or inquire as to where [C]hild was located although he knew [M]other was incarcerated and that [C]hild was born.

When [M]other was released from incarceration, [M]other contacted [Father]. When she contacted him[,] [F]ather failed to inquire as to who was caring for [C]hild.

Throughout the proceedings there was inconsistent testimony about whether [F]ather knew the location of [M]other or how to contact her. In spite of this, although the [c]ourt questions the memory and credibility of [Father],[12] it is clear to the [c]ourt that [Father] throughout the time prior of [*sic*]

---

[12] The court described Father's testimony as "inconsistent and totally unbelievable. I do not accept any of [Father]'s testimony as accurate." N.T., 8/18/21, at 40. Conversely, it found the testimony of Child's custodial mother "credible and persuasive." *Id.*

[C]hild's birth, through the filing of the termination petition[,] was aware [C]hild was born, was aware he was the father, failed to inquire or participate in [C]hild's rearing, failed to contribution [*sic*] financially in any way[,] and took limited, if any, efforts to obtain contact with [C]hild much less perform any parental duties.

. . .

[C]hild is now five (5) years of age (nearly three (3) years of age at the time of the filing of the Petition) and has only known [Custodians] as his parents. [Father] has utterly failed to attempt to overcome the obstacles that may have been impediments in him performing parental duties, however, when he did have the opportunities[,] he failed to perform any parental duties. [F]ather's irresponsibility was further demonstrated by his failure to appear at these proceedings and the one (1) proceeding he did appear at he was late.

The [c]ourt finds that [Custodians] met their burden of establishing by clear and convincing evidence that [F]ather failed and or refused to perform his parental duties for a period in excess of six (6) months prior to the filing of the Petition.[13]

Orphans' Court Opinion, 10/29/21, at 5-6.

Father, however, argues that the orphans' court erred in terminating his parental rights as Child was illegally taken from him without his consent. Father's Brief at 9-10. He asserts that, regardless of any issues of credibility, the circumstances created an insurmountable obstacle by which he was

_____

[13] Although the orphans' court expressed concern that the custody matter proceeded without Father being identified and named as a party, the court noted that the outcome as to the termination of Father's parental rights would be the same. Orphans' Court Opinion, 10/29/21, at 5; N.T., 8/18/21, at 41. We agree. The custody proceeding and the termination proceeding are two separate and distinct proceedings. Further, for the reasons stated **supra**, the record corroborates the orphans' court's determination, bolstered by its rejection of Father's testimony as incredible, that Father failed to perform his parental duties, as well as that termination of Father's parental rights would best serve Child's needs and welfare.

- 11 -

deprived of the chance to further his relationship with Child. *Id.* at 11. Father states:

> If this [c]ourt were to approve of termination under these circumstances, it would open a [P]andora's box in termination of parental rights law in Pennsylvania. In essence, people could take other people's children with the consent of one parent and outside the knowledge of the other. Thereafter, custodians could sue only one parent for custody without including the other. Finally, those same custodians could terminate both parties['] parental rights without ever granting the non-included parent in the child's life at any point in any way.

*Id.*

Upon review, the record supports termination pursuant to Section 2511(a)(1). Critically, the record reveals that Father knew he was Child's biological father. N.T., 8/18/21, at 24-25; N.T., 3/9/21, at 27, 74-75, 105. While subsequently indicating that he was not aware until after Child's birth, Father initially clearly admitted that he always knew he was Child's father. N.T., 3/9/21, at 74-75, 105-06. Father testified:

> Q. And are you -- is it your testimony that you are the father of [Child]?
>
> A. Yes, I am.
>
> Q. Okay. And you would agree that you knew that you were the father of [Child] as early as April of 2017?
>
> A. No. **I knew the whole time.**
>
> Q. Oh, you knew since birth?
>
> A. Yes.
>
> Q. Okay. And that was when [Custodians] had custody then?

- 12 -

> A. No. **I knew when she was pregnant that [Child] was mine.**

*Id.* at 74-75 (emphasis added); *see also id.* at 105 ("I knew he was mine from the beginning."). Further, Father did not see Child until April 2017, after Mother was released from prison, when Child was ten months old, and only had a few visits with Child until Mother's reincarceration in July 2017. N.T., 8/18/21, at 15, 17, 24-25; N.T., 3/9/21, at 27-28, 75, 77-79, 90.[14] Despite recognizing that Mother had been incarcerated at the time of Child's birth, nothing in the certified record indicates that Father inquired as to Child's care during Mother's incarceration. *Id.* at 79. Father conceded that he knew his name was not on Child's birth certificate[15] and that he did not file anything related to custody as he did not believe there would be an issue as he had known Mother for many years. N.T., 3/9/21, at 79-80, 90-92 ("I didn't think we'd have a problem. We've known each other for years.").

Once Mother was reincarcerated in July 2017, there is inconsistent testimony as to when Father knew Mother was in fact reincarcerated. *Id.* at 34, 77-78, 80, 82. As indicated *infra*, Child returned to the care and custody of Custodians in September 2017, where he remained. *Id.* at 10-13, 44. Notwithstanding, Father indicated, without any corroborating evidence, that he contacted the police, who informed him he could not file a missing person's

---

[14] Regardless of Father's inconsistent testimony, Father knew by April 2017 that Child was born and that he was Child's father. N.T., 3/9/21, at 106.

[15] As referenced *infra* at n.8, an updated birth certificate identifying Father was issued on July 22, 2019. *Id.* at 51-55, 104-05.

report as he was not named on Child's birth certificate; child protective services agencies; and Mother's sister, who informed him that Child was with someone with a different first name than Child's custodial mother "far, far away."[16] *Id.* at 77, 84-89, 90-92, 94. He only contacted Lawrence County, the county where he and Mother resided, to inquire regarding any custody filings related to Child. *Id.* at 93-94. Further, Father acknowledged that he did not search public jail records, did not hire an attorney, did not hire a private investigator, and did not write Mother.[17, 18] *Id.* at 80, 89, 92-93. He stated that he became aware of and contacted Custodians upon receipt of the petition for involuntary termination. *Id.* at 76-77, 85, 95.

As such, the record supports the court's determination, upon consideration of the totality of the circumstances, as to Father's failure to perform parental duties, including lack of contact, within the six months prior to the filing of the July 2019 termination petition and throughout Child's life,

_____

[16] Father stated that he contacted Mother's sister through Facebook more than six months after Mother was reincarcerated. *Id.* at 84, 86-87. Notably, Child's custodial mother, D.F., responded to a post on Facebook by Mother's sister as to Child's location. While Father testified that he saw Child's custodial mother's response, it is unclear if this was prior to the filing of the termination petition. *Id.* at 29-34, 84-85.

[17] Although Father claimed a lack of resources, he admitted hiring an attorney with respect to the termination petition. N.T., 3/9/21, at 80-82.

[18] Father testified that he did not write to Mother as he does not write, explaining that he is "not a good speller" and his "writing is terrible." *Id.* at 89. While Mother wrote to Father in 2018, Father alleged that he never received the letter, which Mother sent to a mutual friend of his and Mother's, until 2019. *Id.* at 89, 94-99.

and lack of effort to overcome obstacles. This conclusion is augmented by the court's rejection of Father's testimony as lacking credibility, also substantiated by the evidence and within its discretion. We are mindful of our standard of review set forth above, and reiterated most recently, in ***In re S.K.L.R.***, 256 A.3d 1108, 1127, 1129 (Pa. 2021), that we must not substitute our judgment for that of the trial court. We, therefore, discern no error of law or abuse of discretion and do not disturb the orphans' court's finding of grounds for termination pursuant to Section 2511(a)(1).

We next determine whether termination was proper under Section 2511(b). As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791. . . .

***In re T.S.M.***, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

Father, however, has failed to preserve and waived any challenge related to Section 2511(b) for failure to raise same in the Statement of Questions Involved portion of his brief and failure to offer any such discussion in his brief. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) (citations omitted) (explaining this Court will not review an appellant's claim unless it is included in the statement of questions involved, developed in his or her argument, and supported by citation to relevant legal authority).

Even if Father had preserved a challenge to Section 2511(b), we would conclude that it is without merit. As recognized by the orphans' court, "[Custodians] have cared for [Child] and [Child] is thriving while in their care and these are the only parents this child knows. [Child] knows nothing about his biological father." Orphans' Court Opinion, 10/29/21, at 6. Child only saw Father a few times in the spring/summer of 2017. N.T., 8/18/21, at 15, 17, 24-25; N.T., 3/9/21, at 27-28, 75, 78. Nothing in the certified record indicates that these brief encounters created a parent/child bond between Father and

Child. Moreover, at the time of the hearing, Child was approximately five years old and had been in the custody and care of Custodians for all but a brief period of several months in 2017. N.T., 3/9/21, at 10-13, 44. Custodial mother, D.F., testified that she and her husband, who Child referred to as "Nanna and Pap," desired to adopt Child should the court terminate parental rights. *Id.* at 38, 69. She observed that Child was healthy and meeting his developmental milestones. *Id.* at 69. She further indicated that she and her husband had provided Child "love and care" as well as his daily needs.[19] *Id.* at 38. Hence, regardless of waiver, we would discern no error of law or abuse of discretion in the court's finding that termination of Father's parental rights would best serve Child's needs and welfare pursuant to Section 2511(b).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/14/2022

---

[19] Mother additionally testified that she wanted Child to remain with Custodians. N.T., 8/18/21, at 15 ("I want [Custodians] to have my son.").

- 17 -